934 A.2d 669 (2007)
396 N.J. Super. 432
CITIZENS VOICES ASSOCIATION, a non-profit organization, Plaintiff-Respondent/Cross-Appellant
v.
COLLINGS LAKES CIVIC ASSOCIATION, et al.,[1] Defendants-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 3, 2007.
Decided November 8, 2007.
*670 Samuel J. Myles, Woodbury, argued the cause for appellants/cross-respondents (Holston, MacDonald, Uzdavinis, Eastlack, Ziegler & Lodge, attorneys; Mr. Myles, on the brief).
Cris D'Arrigo, Bridgeton, argued the cause for respondent/cross-appellant (D'Arrigo & D'Arrigo, P.C., attorneys; Mr. D'Arrigo, on the brief).
Before Judges WEFING, PARKER and LYONS.
The opinion of the court was delivered by
LYONS, J.A.D.
Defendant Collings Lakes Civic Association (CLCA) appeals from the entry of a judgment finding that it does not have the right to increase a $48 annual charge to property owners absent their consent. The annual charge is contained in a deed restriction in their chain of title for the privilege of using the lakes, beaches, and certain recreational facilities of Collings Lakes. CLCA further appeals from the finding that it does not have the right to collect attorneys' fees from individual property owners in conjunction with litigation to collect the annual $48 charge, except as specifically permitted in applicable court rules.
*671 Plaintiff Citizens Voices Association (CVA) cross-appeals from the provision in the judgment, which determined that the $48 annual owners' charge is valid and enforceable as to those property owners who are subject to a deed restriction containing the charge. The following factual and procedural history is relevant to our consideration of the issues advanced on appeal.
This matter arises out of a dispute among certain residents of Collings Lakes. Collings Lakes is a lake community formed in the 1950's consisting of approximately 1100 homes. There are four lakes and four dams in the community, along with playgrounds, beaches, and parking facilities. The Collings Lakes development covers a considerable amount of land in three municipalities (Buena, Folsom, and Monroe) and is situated in the counties of Atlantic and Gloucester. Certain master deeds were recorded when the development was created.[2] CLCA asserts that the master deeds of Collings Lakes place certain covenants and restrictions on all the parcels of land that make up Collings Lakes. A sample of the covenants and restrictions reads as follows:
Each lot hereinbefore referred to shall be subject to an annual charge of $48.00, and the Grantees, his, her, their or its heirs, successors, executors, administrators, and assigns, agree to pay to the Grantor, its successors and assigns, the sum of $48.00 for each lot annually, in advance, on the 1st day of each year or such other day as Grantor, its successors or assigns, shall designate hereafter, for beach, lakes, rivers, parking areas, boat landing and playground privileges, [whether] or not such privileges are exercised. The title in fee simple to land designated as beaches, lakes, rivers, parking areas, boat landings and playgrounds is to be retained by the Grantor, its successors and assigns, and the Grantee, his, her, their or its heirs, successors, executors, administrators and assigns, shall be subject to the Grantor's, its successors or assigns, rules and regulations now in force, or which may from time to time be made by the Grantor, its successors or assigns. It is expressly agreed that said charge shall constitute a debt which the Grantor, its [successors] or assigns, may collect by suit in any court of competent jurisdiction, and upon the passing of title to any of the land included in said tract, the owner or owners from time of acquiring title thereto, shall be held to have covenanted and agreed to pay Grantor, its successors or assigns, the aforementioned annual $48. charge; the said charge shall likewise constitute and be a first and prior lien on premises referred to herein, subject only to the lien of any real estate taxes, municipal water or sewer rents (if any), government-insured mortgages, or any other bona fide first mortgage which may hereafter be created or which may now exist thereon.
The Grantor, its successors and assigns, shall be the owner of said charge, debt or lien for the beach, lakes, rivers, parking areas, boat landing and playground privileges, and shall each spring and autumn clear the playgrounds, beaches, parking areas, and boat landings, and the woods immediately bordering thereon, to the end that reasonable usage and appearance of said will be maintained. Grantee, for himself, herself, themselves, or itself, his, her, their *672 or its heirs, successors, executors, administrators and assigns, covenants and agrees that his right to use said beaches, lakes, rivers, parking areas, boat landings and playgrounds shall be subject to the rules and regulations which may from time to time be promulgated with reference thereto, and vests Grantor, its successors and assigns with the power to deprive any persons, including Grantee, members of his, her or their families, his, her, their or its heirs, successors, executors, administrators and assigns, of the use of such beaches, lakes, rivers, parking areas, boat landings and playgrounds, temporarily or permanently, for failure to comply with such rules and regulations.
Another deed provision states:
Failure to impose or enforce for any reason any restrictions, conditions, covenants or agreement herein contained, shall in no event be deemed a waiver of a right to do so thereafter; as to the same breach or as to one occurring prior or subsequently thereto, and invalidation of any one of these covenants by judgment or court order shall in no wise affect any of the other provisions, which shall remain in full force and effect, and any written approval by the Grantor, its successors and assigns, of any act shall be subject to any Municipal, County, State or Federal rules, regulations or laws.
While the language of the covenants in each master deed differs slightly, it is not disputed that each such master deed contains covenants which were substantially identical to the language set forth above. There is some dispute, however, as to whether all residents of Collings Lakes have taken title to their individual lots subject to master deeds containing the covenants and deed restrictions just described. We do not have the benefit, nor did the trial court, of a complete detailed title search as to all of the lots in the Collings Lakes community. Therefore, our opinion with respect to the issues advanced by the parties is only applicable to those lots encumbered by master deeds containing these and similar covenants and deed restrictions mentioned above.
In August 1956, Collings Lakes, Inc., the original developer, entered into a series of transactions. In one of the transactions, Collings Lakes, Inc. transferred to Collings Lakes Development Co. a substantial number of sub-divided lots. The record indicates that these lots constitute the dominant estates which maintain the right to enter upon and use the recreational areas, including the beaches and lakes. In an agreement (1956 Agreement) between Collings Lakes, Inc. as the seller and Collings Lakes Development Co., as well as Frank Adamucci, the purchasers, the parties agreed as follows:
[Collings Lakes, Inc.] does hereby grant, assign, and set over unto [Collings Lakes Development Co. and Frank Adamucci], their successors and assigns, the right to use the waters, lakes, beaches and parking area and recreational facilities maintained by [Collings Lakes, Inc.] on those lands set forth in Schedule B, which rights shall be co-extensive with and equivalent to those rights previously granted by [Collings Lakes, Inc.] to grantees of lots in the filed sections of the project known as Collings [] Lakes, Inc.

[Collings Lakes, Inc.] agrees to maintain the said waters, lakes, beaches, parking areas, and recreational facilities, which obligation of maintenance shall be equivalent to that obligation imposed on [Collings Lakes, Inc.] by any restriction, condition, reservation or covenant previously created by it on any lands previously sold by it in filed sections *673 on the project known as Collings [] Lakes, Inc. . . . It is agreed, however, that the rules and regulations of [Collings Lakes, Inc.], its successors and assigns, shall never impose a financial obligation on [Collings Lakes Development Co. and Frank Adamucci], their successors or assigns, for the use of the facilities in question, nor shall they impose on [Collings Lakes Development Co. and Frank Adamucci] their successors or assigns, any obligation whatsoever greater than the obligation imposed by [Collings Lakes, Inc.] in deeds to its grantees of lots in the filed sections of Collings [] Lakes, which deeds were recorded prior to the date of this instrument. (Emphasis added).
Based on the master deeds and this agreement, it is clear that the property owners whose property is encumbered with these master deeds and this agreement have the right to use the Collings Lakes rivers, lakes, beaches, parking areas, and recreational facilities, which are to be maintained by the developer for an annual charge of $48. The developer explicitly agreed to maintain these recreational facilities. The developer also agreed that it would never impose a financial obligation on the property owners for their use of the facilities, nor would the developer impose on the property owners "any obligation whatsoever greater than the obligation imposed" by the developer in its master deeds, that is, the $48 annual charge.
CLCA's original certification of incorporation was filed on March 23, 1956. It was not created as a homeowners' association and membership was not mandated for all of the property owners. In 1979, following litigation between the developer and CLCA, a consent order was entered which transferred the recreational areas then owned by the developer (the beaches, lakes, dams, parking facilities, and playgrounds) and the right to collect the $48 fee to CLCA. CLCA, therefore, became the successor and assignee of the developer with respect to the covenants and restrictions.
In 1982, a dispute arose concerning the enforceability of the deed restrictions. That matter was resolved by a court order in 1984 which stated that "the deed restrictions were valid and CLCA had the right to collect the annual $48 fee." As to the then-outstanding obligations owed by the property owners, the court further stated that because of certain unusual circumstances, the obligation to pay the fee would run from the date of the court's decision forward.
While there is significant dispute between the parties to this action as to the efficacy of the efforts of CLCA in collecting the fees and maintaining the property going forward, the record is clear that fees were, in fact, collected from some of the residents on a regular basis and that certain maintenance activities were performed by CLCA during the recent past.
Commencing in or around 2000, correspondence between the New Jersey Department of Environmental Protection (DEP) and CLCA began. In its correspondence, the DEP demanded certain required upgrades be made to the Collings Lakes dams pursuant to the Safe Dam Act. N.J.S.A. 58:4-1 to -10. The enforcement provisions of the act, N.J.S.A. 58:4-5, provide that an owner who has control of a dam who fails to comply with an order issued by the DEP may be liable to the DEP for the costs of removal of the dam. The statute further states that if two or more owners or persons having control of the dam are liable, the DEP can allocate the costs among the liable parties.
CLCA determined that the funds it had on hand from the $48 annual assessment *674 would not satisfy the costs to maintain and operate the recreational areas, as well as to perform certain capital improvements, which may be required by the DEP. Hence, CLCA amended its bylaws and increased the maintenance fee from $48 to $75 per year. The record does not indicate, though, what specifically the DEP required to be done to the dams, nor are there proofs of the specific costs that would have been incurred for the contemplated repairs and continued maintenance costs. CLCA also adopted a policy that it would collect attorneys' fees and costs. It was also CLCA's policy to charge interest with respect to delinquent annual maintenance fees.
Because of CLCA's actions, CVA filed this lawsuit to quiet title and remove the deed restrictions of record. CLCA filed an answer and counterclaim, which sought a declaratory judgment that the deed restrictions were valid and that it had the right to assess property owners for additional costs for repairs, maintenance, and attorneys' fees.
The trial court ordered plaintiff to serve all of the lot owners in Collings Lakes with the complaint. That was done. Following discovery, the parties filed cross-motions for summary judgment. After oral argument, the court ruled that the deed restrictions imposing a $48 yearly fee were enforceable as to those parties whose properties were so encumbered; that CLCA did not have the right to collect attorneys' fees in its collections actions except as permitted by court rules; and that CLCA did not have the right to increase the annual fee or otherwise assess property owners.
The trial court found that the questioned collection efforts by CLCA did not constitute abandonment. The trial court likewise found that the alleged failure by CLCA to adequately maintain the lakes, dams, playgrounds, and beaches did not amount to abandonment. The court found the covenant to pay $48 was clear. It acknowledged that the general rule is that the dominant estate has a right to maintain an easement and with that right to maintain goes the obligation to pay for that maintenance absent an agreement to the contrary. The court found, however, that in this case there was a very specific agreement to the contrary. The servient estate promised to maintain the easement and not to raise the annual fee beyond $48. The trial court concluded that there was no basis, therefore, in the relevant documents or the law for CLCA to increase the fee from $48 a year. The trial court also concluded that there was no authority in the relevant documents or law for CLCA to assess attorneys' fees against property owners, except as may be permitted by any appropriate court rule or statute. This appeal ensued.
On appeal, CLCA argues that the trial court erred in refusing to allow it to increase the annual owners' charge. CLCA further argues that the trial court erred in refusing to permit it to collect attorneys' fees, interest, and costs in any collection actions that it may file to collect unpaid annual owners' charges.
On cross-appeal, plaintiff argues that defendant should be found to have abandoned its rights, that defendant should be barred by laches from collecting the annual owners' charge, and that the trial court was correct in not permitting defendant to increase the annual owners' charge and collect attorneys' fees, interest, and costs on its collection efforts.
The arguments raised by the parties to this appeal essentially relate to whether the deed restrictions remain valid and whether CLCA may increase the annual charge and assess attorneys' fees against delinquent payors.
*675 We begin our consideration of the arguments and issues by restating applicable legal principles. In reviewing a judgment entered by way of summary judgment, we must first decide whether there were genuine issues of material fact. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App. Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). If there were none, we must then decide whether the trial court's ruling on the law was correct. Ibid. While there were certain factual issues raised by the parties, we find that no genuine issues of material fact were presented to the trial court. The issues presented, therefore, are related to the application of applicable law.
"[V]iolations of restrictive covenants can constitute an abandonment of a neighborhood scheme in whole or in part. . . ." City of Paterson v. Schneider, 31 N.J.Super. 598, 604, 107 A.2d 553 (App. Div.1954). Such violations, however, must be such as
to indicate an abandonment or modification of the original general plan which makes an enforcement of the plan inequitable because of changed conditions. The violations must be so pervasive as to indicate either a change in the neighborhood or a clear intent on the part of the property owners generally to abandon or modify the original plan.
[Murphy v. Trapani, 255 N.J.Super. 65, 74, 604 A.2d 635 (App.Div.1992) (internal citations omitted).]
"`Laches is an equitable defense that may be interposed in the absence of the statute of limitations,' and is defined as `an inexcusable delay in asserting a right.'" Borough of Princeton v. Bd. of Chosen Freeholders, 169 N.J. 135, 157-58, 777 A.2d 19 (2001) (quoting Northwest Covenant Med. Ctr. v. Fishman, 167 N.J. 123, 140, 770 A.2d 233 (2001)).
A review of the deeds and agreements of record which created the easement and attendant covenants clearly reveals that the developer granted the homeowners the right to use the lakes, beaches, and recreational facilities on condition that an annual payment of $48 be made. The developer expressly provided that it was to maintain the common areas and it expressly assumed that responsibility. By the 1956 Agreement, it further promised to the homeowners that it would never increase obligations of the homeowners.
The record indicates that the developer's successor, CLCA, took certain actions to enforce the payment obligation and certain other actions to maintain the common area. While there is a dispute as to whether the collection efforts were diligent or lackadaisical, as well as whether the maintenance efforts were satisfactory, the record certainly reveals there were some efforts made by the developer's successor to collect the fees and maintain the property. In order for there to be an abandonment by CLCA, the law requires clear evidence of relinquishment. See Murphy, supra, 255 N.J.Super. at 73-75, 604 A.2d 635. That certainly is not present here, nor were there laches. Given the amount at issue and the cost to collect same, there was no inexcusable delay. Evidence of failure to take advantage of the benefits of a covenant provision even for a lengthy period is seldom sufficient to persuade a court that abandonment has occurred. See Restatement (Third) of Property: Servitudes § 7.4 comment c (2000). Intent to abandon has to be established. Id. § 7.4 reporter's note. We, therefore, agree with the trial judge's conclusion that the easement and attendant covenants are valid and enforceable and have not been abandoned.
*676 Our Supreme Court in Bubis v. Kassin, 184 N.J. 612, 878 A.2d 815 (2005), held that in construing covenants, the court's primary objective "`is to determine the intent of the parties to the agreement.'" Id. at 624, 878 A.2d 815 (quoting Lakes at Mercer Island Homeowners Ass'n v. Witrak, 61 Wash.App. 177, 810 P.2d 27, 28 (1991)). Generally, in the context of restrictive covenants, a rule of strict construction should be applied. Ibid. Absent explicit indications of a special meaning, words in such covenants are given their ordinary meaning. Ibid.
We have recognized that the right of a dominant tenant to maintain and repair the easement is recognized as an incident to the beneficial use of the easement. Island Improvement Assoc. v. Ford, 155 N.J.Super. 571, 574, 383 A.2d 133 (App. Div.1978). Our court stated that, "[c]onvinced that with the benefit ought to come the burden, absent agreement to the contrary, we hold that the obligation to maintain devolves upon the dominant tenant." Ibid. This position has been recognized in section 4.13 of the Restatement (Third) of Property: Servitudes which provides that "[u]nless the terms of a servitude . . . provide otherwise, duties to repair and maintain the servient state and the improvements used in the enjoyment of a servitude are as follows: (1) The beneficiary of an easement . . . has a duty to the holder of the servient estate to repair and maintain the portions of the servient estate and the improvements used in the enjoyment of the servitude that are under the beneficiary's control. . . ." This principle has been recognized by our court in Lake Lookover Prop. Owner's Assoc. v. Olsen, 348 N.J.Super. 53, 67, 791 A.2d 270 (App. Div.2002).
The trial judge denied CLCA the right to increase the annual assessment. We agree that on this record and at this time that is an appropriate conclusion. This case is different than the Island Improvement and Lake Lookover cases in that there is a separate, explicit agreement as to the payment of fees and the obligation to maintain the easement property. The parties have, by agreement, changed the normal burdens and obligations found in connection with easements.
CLCA, to the extent it can demonstrate that a property owner is subject to the easements and restrictions, has the right, therefore, to collect the $48 annual fee. We agree with the trial judge that the question of interest and attorneys' fees would abide each individual case and would be subject to the applicable court rules and statutes.
There is one point on which we are compelled to comment. The judgment entered in this case dismissed with prejudice plaintiff's complaint seeking a determination that the deed restrictions are invalid and unenforceable, as well as plaintiff's complaint seeking a declaration that the restrictions in question should be removed of record. The judgment also denied with prejudice CLCA's request for authorization to approve an increase in the annual owners' charge. A judgment entered "with prejudice" is the equivalent of a judgment entered on the merits and is considered a final judgment. Mayflower Indus. v. Thor Corp., 17 N.J.Super. 505, 509, 86 A.2d 293 (Ch.Div.1952) (holding that a dismissal "with prejudice" concludes the rights of the parties as if the suit had been prosecuted to final adjudication adverse to the moving party). As such, it would normally be considered res judicata as to the issues addressed. However, the judgment in this case addresses the parties' continuing activities, specifically CLCA's continuing right to collect the annual $48 owners' charge and its duty to maintain the recreational property *677 and plaintiffs' rights to use the recreational property and pay the annual charge.
The res judicata consequences of [a judgment such as this one] follow normal lines while circumstances remain constant, but those consequences may be affected when a material change of the circumstances occurs after the judgment. Thus if the judgment denied on the merits the continuing relief sought, but there has been a later material change of conditions, a new claim may arise upon the later facts (to be considered sometimes in combination with the old), and that claim will be held not barred by the previous judgment. If the judgment was one granting continuing relief, and a change of circumstances makes the judgment too burdensome or otherwise inapposite as a regulation of ongoing conduct, it is ordinarily possible for the party concerned to apply to the rendering court for a modification of the terms of the judgment. And in deciding whether a judgment granting or denying continuing relief should be given any preclusive effect in a later action on a different claim, the question arises whether the issues in the two actions are materially different because of events which occurred in the interim, in which case preclusion is to that extent to be denied.
[Restatement (Second) Judgments § 13 comment c (internal citations omitted).]
At present, there are no firm actual costs in the record of what must be paid by CLCA to repair the dams and maintain the lakes and beaches. The record does not indicate whether, if the back fees are paid and appropriate governmental loans are granted, CLCA would be able to fulfill its obligation to maintain the facilities. Subsequent to our decision, there may well be a substantial capital improvement needed to preserve the purpose of the servitude. The cost of such improvements may be firmly identified and potentially even assessed against all of the owners by the DEP under the Safe Dam Act. N.J.S.A. 58:4-1 to -10. The lack of funds to maintain the lakes may well create a "blighted area" with a significant decrease in some or all of the property values in Collings Lakes. The health and safety of the public may be at issue if certain developments occur. There may be an unfair shifting of the burden to correct the problems with the lakes to the general public and individual taxpayers outside of the Collings Lakes community, which may require court intervention. Likewise, CLCA may fail to maintain the recreational areas and decide to abandon them. The lakes may be drained voluntarily by CLCA or by the DEP. The costs of maintaining the lakes may become prohibitively high for any group to undertake.
In such circumstances, we note a court has a reservoir of equitable power to modify or terminate a servitude should changes occur in the future which would make it impossible as a practical matter to accomplish the purpose for which the easement was created. See Restatement (Third) Property: Servitudes, supra, § 7.10(1) ("When a change has taken place since the creation of a servitude that makes it impossible as a practicable matter to accomplish the purpose for which the servitude was created, a court may modify the servitude to permit the purpose to be accomplished. If modification is not practicable, or would not be effective, a court may terminate the servitude."). See also Kline v. Bernardsville Assoc., Inc., 267 N.J.Super. 473, 479, 631 A.2d 1263 (App.Div. 1993); Murphy, supra, 255 N.J.Super. 65, 604 A.2d 635. Comment a to section 7.10 points out that the changed-conditions doctrine may permit a court to modify a covenant. Restatement (Third) Property: Servitudes, supra, § 7.10 comment a. It *678 notes the doctrine may be grounded in the implied intent of the parties and public policy. Ibid. Courts apply the changed-conditions doctrine with caution, though. Ibid. Further, "[t]he test is stringent: relief is granted only if the purpose of the servitude can no longer be accomplished." Ibid. Generally, covenants will be enforced in equity only so long as they remain reasonable in light of their purpose. See Id. § 8.3 comment e.
Therefore, if there were a material change in circumstances, pursuant to law, a court could modify the covenants restricting increasing the annual $48 charge, provided the modification was equitable as to all parties and would preserve the purpose of the servitude. See Perelman v. Casiello, 392 N.J.Super. 412, 423, 920 A.2d 782 (App.Div.2007) (finding "changed circumstances or the relevant equities [may] preclude enforcement or warrant modification of the restrictive covenant"). Likewise, a court in the appropriate circumstance could determine modification is not practicable and terminate the easement and restrictions.
Accordingly, we affirm the trial court's order, but clarify that the dismissals with prejudice of CLCA's request to increase fees and plaintiff's request to terminate the restrictions are based solely on the record presented at this time. There may well come a time when a strong equitable argument can be raised consistent with the principles of the Restatement that would compel either an increased assessment or the termination of the restrictions.
In conclusion, we clearly recognize that this case presents a sad commentary on a divided community. Allegations of self-interest on each side are rampant. Each side wants its position to be vindicated at the expense of the other. Plaintiffs wish to contribute nothing to the maintenance of the lakes and beaches which they may or may not use themselves, but which may increase their long-term property values if appropriately maintained. Plaintiffs further seek to be absolved of any past obligations they may have had for the privileges afforded them. Defendants seek to shift to all property owners, even those who may not have a view or ready access to the lakes, the same financial burden they, as lakefront owners, have regardless of the condition of the recreational areas. Neither side seems to appreciate the others' difficulties with their positions and all have certainly ignored the common good. Most of all, they have ignored the fact that the common good cannot be accomplished without certain sacrifices from all parties. We urge the parties to consider that future litigation and regulatory enforcement actions will be expensive and may result in a determination that pleases no one. Consequently, we conclude by urging the parties to utilize their best efforts, perhaps with the assistance of a mediator, to amicably and rationally resolve their common problem for the common good.
Affirmed.
NOTES
[1] For brevity sake, we have not listed the 1,153 property owners of Collings Lakes who are also named as defendants.
[2] Not all the master deeds for all of the property alleged in the development are within the record.